[Civ. No. 4887. Second Appellate District, Division Two.—May 29, 1925.]

GEORGE SHELLEY, Respondent, v. J. C. BYERS, Individually and as Sheriff, etc., Appellant.

[1] APPEALS—DENIAL OF NEW TRIAL.—An order denying a motion for a new trial is not appealable, and an attempted appeal therefrom must be dismissed.

[2] PLEDGE — MORTGAGE — PERSONAL PROPERTY — TITLE. — Under our statute a mortgage of personal property in possession and a pledge are practically, if not identically, the same; and no legal title passes in either case, but merely the right of possession for the purposes of security.

[3] ID.—SALE—CONSTRUCTION OF CONTRACT.—It is often difficult to determine whether a particular transaction in which the right is

---

1. See 2 Cal. Jur. 173.

2. Definition and nature of pledge, note, 49 Am. Dec. 730. Chattel mortgage as distinguished from pledge, note, Ann. Cas. 1912B, 962. See, also, 21 R. C. L. 632; 21 Cal. Jur. 290.

3. Sale as distinguished from pledge, note, Ann. Cas. 1915A, 1082. See, also, 21 Cal. Jur. 292.

reserved to the vendor to repurchase the property at a stipulated price within a given time constitutes a pledge or a sale; and whether it be one or the other must be determined by a consideration of the peculiar circumstances of each case.

[4] ID.—WRITTEN AGREEMENT—LATENT AMBIGUITIES—DOUBTFUL PROVISIONS—PAROL EVIDENCE.—Though the agreement of the parties be reduced to writing, if there be latent ambiguities therein, or if the language of the writing will admit of more than one interpretation, or if the intention of the parties is left in doubt from a reading of the document, parol evidence of the circumstances and of the situation of the parties may be considered in order to ascertain their true intention, and in this manner an issue of fact may be presented to the trial court for its interpretation; but where the language of the written contract is free from ambiguity or uncertainty, the determination of the intent of the parties, and hence a determination of the true character of the transaction, i. e., whether it is a pledge or a sale with the right of repurchase reserved to the vendor, presents a question of law for the court, and not a question of fact.

[5] ID.—BONUS—DEFINITION OF TERM.—In its strict sense, "bonus" means good; but in its popular sense it has several meanings, one of them being that it is a sum paid for services, in addition to or in excess of what ordinarily would be given, and another being that it is a premium paid for a loan of money.

[6] ID.—BONUS AS INTEREST—CONSTRUCTION OF CONTRACT.—Where a vendor sells goods to another, reserving the right to buy them back within a specified time at a higher figure, which increase is termed a "bonus," such provision of the contract will not be interpreted as requiring the payment of such increase as a premium by way of interest on the money paid to the vendor, if there be some other possible or reasonable interpretation, where the former interpretation would violate the usury law and subject the vendee to punishment for a misdemeanor.

[7] ID.—ADVANCE OF MONEY — PERFORMANCE OF SERVICES — IMPLIED OBLIGATIONS—PERSONAL LIABILITY.—Where a person agrees to "advance" to certain bankrupts a sufficient sum of money, up to a specified amount, to effect a composition with the creditors of the bankrupts, such word "advance" implies a loan and a promise to repay the money advanced, with legal interest; and where the agreement with the bankrupts provides that the person making such advance is to take possession of and operate the store of the bankrupts until such advance is repaid, a promise on the part of the bankrupts to pay said person for the services performed in oper-

4. General rule that parol evidence not admissible to vary, add to or alter a written instrument, notes, 56 Am. St. Rep. 659; 17 L. R. A. 270. See, also, 10 R. C. L. 1016; 10 Cal. Jur. 916.

ating the store will be implied in fact as well as in law, and the bankrupts will be personally liable therefor, provided such personal liability is not excluded by the terms of the agreement.

[8] ID.—WRITTEN CONTRACT—COMPLETE AGREEMENT—PRESUMPTION.— Where the written contract between said bankrupts and the person agreeing to advance them the money necessary to effect a composition with the creditors appears upon its face to be a complete expression of the whole agreement between the parties, it is to be presumed that they introduced into their writing every material item and term of their contract.

[9] ID.—IMPLIED SECURED OBLIGATION—PERSONAL LIABILITY.—The existence of a pledge or of a mortgage implies an obligation to be secured thereby, but personal liability on the part of the pledgor or mortgagor for the debt or other obligation secured by the pledge or mortgage is not an indispensable requisite.

[10] ID. — SALE OF PLEDGE PROPERTY — NONCOMPLIANCE WITH BULK SALES LAW—FRAUD PRESUMED.—Where the contract between certain bankrupts and a person agreeing to advance to them a sufficient sum of money to effect a composition with the creditors of the bankrupt states that the bankrupts "hereby sell, transfer, assign, grant and set over" to the person advancing such money the stock in trade of the store of the bankrupts, but such contract, as a whole, shows the transaction to be a pledge, a subsequent sale or transfer of said stock in trade by the bankrupts to a third party, if not made in accordance with the provisions of section 3440 of the Civil Code, is presumed to be fraudulent as to then existing creditors of the bankrupts; and it is immaterial that said bankrupts do not have possession of the stock in trade at the time of said attempted sale or transfer to said third party.

(1) 3 C. J., p. 505, n. 55. (2) 11 C. J., p. 299, n. 3; 31 Cyc., p. 808, n. 43. (3) 35 Cyc., p. 34, n. 39. (4) 22 C. J., p. 1192, n. 11; 35 Cyc., p. 123, n. 10. (5) 9 C. J., p. 136, n. 29, 35. (6) 39 Cyc., p. 930, n. 3. (7) 30 Cyc., p. 1180, n. 1; 35 Cyc., p. 39, n. 63. (8) 22 C. J., p. 1102, n. 97. (9) 35 Cyc., p. 39, n. 64. (10) 27 C. J., p. 883, n. 34.

APPEAL from a judgment of the Superior Court of San Diego County. C. N. Andrews, Judge. Reversed.

The facts are stated in the opinion of the court.

9. Personal obligation on part of transferor to repay money received from transferee, note, L. R. A. 1916B, 390.

Effect of contracts requiring vendor or mortgagee to look to property alone for payment, note, 17 A. L. R. 718.

Joseph Kirk, Treadwell, Tompkins & Clark and Joseph A. Pritchard for Appellant.

Gordon Gray, Walter Ames and C. C. Carleton for Respondent.

FINLAYSON, P. J.—This is an action to recover personal property seized by defendant, the sheriff of San Diego County, under a writ of attachment issued in an action against plaintiff's assignors. The complaint alleges that plaintiff is the owner and entitled to the possession of the property. The answer denies this allegation. Whether plaintiff is the owner is the prime question in the case. The court found for plaintiff and entered judgment for him accordingly. Defendant appeals from the judgment and likewise from an order denying his motion for a new trial. [1] The latter order is not appealable, and the appeal therefrom must be dismissed.

The facts necessary to an understanding of the case are substantially these: On and prior to February 4, 1922, plaintiff's three sons, Louis Shelley, Benjamin Shelley, and Abe Shelley (hereafter referred to as the "Shelley boys"), were copartners doing business in San Diego at a place known as the Army Department Store, where they were engaged in selling merchandise consisting of groceries, tobacco, shoes, sport goods, men's furnishings, toys, and dry-goods. On the date last mentioned the Shelley boys instituted a voluntary proceeding in bankruptcy in the United States court, and thereafter were adjudged to be voluntary bankrupts. On March 22, 1922, Julius Gollober and I. Rosenberg, residents of San Francisco, and the three Shelley boys, the former as the parties of the first part and the latter as the parties of the second part, executed a written instrument upon the face of which there was what purported to be a "sale" by the Shelley boys to Gollober and Rosenberg of certain property, including all of the stock in trade in the Army Department Store, with a right to repurchase reserved to the Shelley boys. The goods seized by defendant, 1,813 pairs of shoes, were a part of the stock in trade referred to in that instrument. The pivotal point in the case involves the construction of this contract, appellant claiming that it was a pledge to Gollober and Rosenberg of

the personal property mentioned therein, and respondent claiming that it was a sale to Gollober and Rosenberg with an optional right to repurchase reserved to the Shelley boys. It will be necessary, therefore, to state the provisions of the contract with some detail.

The instrument in question commences by reciting that the Shelley boys, the parties of the second part, had been adjudicated bankrupts, that they had offered to their creditors a certain composition, and that the parties of the first part, Gollober and Rosenberg, had agreed to advance a sum of money, up to $140,000, to effect such composition. The essential features following such recitals are these: The parties of the first part agree that they ''will advance, as soon as required by the referee in bankruptcy to effect said composition, a sufficient amount of money, up to the sum of One Hundred Forty Thousand ($140,000) Dollars, as will be necessary to effect said composition. Should any further sum be required for the purpose of making said composition the parties of the second part agree to pay said sum.'' The parties of the second part ''hereby sell, transfer, assign, grant and set over unto the parties of the first part all of the following described property, to wit: [Then follows a description of the stock in trade in the Army Department Store, certain other personal property, including certain choses in action, and certain real property.]'' The parties of the second part agree to ''execute any and all agreements, papers, deeds or bills of sale that may be necessary to transfer any of said property to the parties of the first part.'' The parties of the first part ''do hereby agree to sell the parties of the second part all of the said property . . . for the consideration of One Hundred and Fifty Thousand ($150,000) Dollars, which is to be paid by the parties of the second part to the parties of the first part in the following manner: . . . Immediately upon the confirmation of the composition . . . between the parties of the second part and their creditors, the parties of the first part will at once enter into and take possession of all of the said partnership property,'' or so much thereof as may be delivered to them by the receiver in bankruptcy upon the confirmation of said composition, and they ''will sell to the best advantage all of the said property hereinbefore referred to and transferred to them, excepting all of the merchandise,.

fixtures and lease of the said store in the Arcade Building known as the Army Department Store, and will apply the receipts from such sales upon the purchase price of $150,000 hereinbefore referred to.'' The parties of the first part ''will, as soon as practicable, reopen said Army Department Store, and conduct a sale therein of the merchandise therein situated, together with such other merchandise as may be placed therein pursuant to the terms of this agreement, and operate said store,'' and they ''will advance a further sum of money up to Fifteen Thousand Dollars for the purpose of replenishing and filling in the stock of merchandise in said store, which said sum shall be paid to said parties of the first part in addition to the said sum of One Hundred and Fifty Thousand Dollars before the parties of the second part shall be entitled to delivery of said store, fixtures, merchandise, etc. The parties of the first part shall have the sole control and custody of said business and the exclusive management thereof free from any interference'' by the parties of the second part. From the proceeds of the business there shall be deducted: (1) the expenses of operating the business; (2) so much of the balance of said proceeds, not exceeding twenty-five per cent, as may be necessary to replenish the stock of merchadise; and (3) the balance of such proceeds ''shall be retained by the parties of the first part to apply on the purchase price of said store, fixtures and lease [i. e., to apply on the $150,000 upon the receipt of which by the parties of the first part they undertook to resell the property on hand to the parties of the second part].'' The parties of the first part ''will keep a correct account of the sales, expenses and disbursements of said business, and the parties of the second part shall have full access to all books and records of said business at all reasonable times, and shall receive weekly statements of the business done in said store.'' Upon the payment to the parties of the first part ''of the said purchase price of One Hundred and Fifty Thousand ($150,000) Dollars, in the manner hereinbefore provided, from the sale of said property, or from the operation of said business or otherwise, and the payment of all moneys advanced by said parties of the first part for the replenishment of stock of merchandise for said Army Department Store, the parties of the first part immediately will sell, assign, transfer and set over unto the parties of the

73 Cal. App.—4

second part all of the said property hereinbefore described then remaining in the hands of said parties of the first part, together with all additional merchandise or property that may have been purchased by said parties of the first part for the replenishment of said stock of merchandise in said store, . . . and will execute any and all notices, papers, agreements, bills of sale and documents that may be necessary to effect said transfer.'' The parties of the second part ''shall have four months from the date said parties of the first part receive possession of said property within which to complete the payments of said purchase price.'' If at the termination of the four months the parties of the second part shall have failed to pay the above-mentioned purchase price, or if the parties of the first part shall have failed to receive the same from the net proceeds of sales, then and in that event the parties of the first part shall be under no obligation to sell or transfer the merchandise and fixtures or other property to the said parties of the second part, and the agreement shall *ipso facto* terminate and be annulled, ''and said parties of the first part shall retain all moneys taken and received from the sales of said merchandise, stock in trade, fixtures, etc., and said parties of the second part shall have no claims of any kind or character against said parties of the first part for any transfer or sale of said merchandise and fixtures and property or any part thereof.'' Time is made ''of the essence of this agreement.''

Though the document states that the Shelley boys ''hereby sell, transfer, assign, grant and set over'' unto Gollober and Rosenberg the merchandise and other property described therein, the transfer, whatever be its character, was not a transfer *in praesenti*. Its consummation as a present transfer was dependent upon the receiver's confirmation of the proposed composition with the Shelley boys' creditors. Without doubt, the receiver, at some time, did confirm the composition with the creditors, but it does not appear from the record when it was that the confirmation was made. Until the proposed composition was confirmed by the receiver there was no consummated sale or consummated pledge or consummated transfer of any character from the Shelley boys to Gollober and Rosenberg, and until such confirmation the latter had no right of possession whatever. The evidence upon the subject of delivery to

Gollober and Rosenberg is not very clear. Their manager seems to have taken possession for them on April 14, 1922. At any rate, the parties seem to have treated that date as the commencement of the four-months' period mentioned in their written contract. On April 6, 1922, they caused to be recorded in the county recorder's office a notice that on April 14, 1922, the Shelley boys intended to sell to Gollober and Rosenberg the merchandise referred to in the above mentioned contract. This notice was given pursuant to the Bulk Sales Law, found in section 3440 of the Civil Code. It is ·probable that the date mentioned in the notice was the approximate date of the receiver's confirmation of the composition with the creditors, and that it therefore was the date when the transfer to Gollober and Rosenberg, whatever be its character, was consummated. Be that as it may, without undertaking to fix the date when the composition with the creditors was confirmed, we shall assume, for the purpose of this decision, that the transfer to· Gollober and Rosenberg, when consummated by the receiver's confirmation, was accompanied by an immediate delivery and was followed by an actual and continued change of possession.

Upon several occasions during the four months ·mentioned in the contract plaintiff advanced for his three sons certain sums of money to enable them to repay some of the amount which had been advanced for them by Gollober and Rosenberg to pay the claims of creditors. The sums so advanced by plaintiff aggregated about $30,000. On August 14, 1922, the last day of the four-months' period, there remained of the $150,000 a balance of about $30,000 uncollected by and unpaid to Gollober and Rosenberg. On that date plaintiff, his three sons and Gollober met in the store at San Diego. Gollober, on behalf of himself and Rosenberg, in consideration of the sum of $1,000 paid to him by plaintiff, agreed to extend for about six weeks the four-months' period within which the Shelley boys might exercise their right to repurchase the property. Thereupon plaintiff orally agreed with his three sons that if he paid to Gollober and Rosenberg the $30,000 necessary to entitle his sons to repurchase, he would own the store and its contents and they would assign it to him. The next day

the Shelley boys signed and caused to be mailed to Gollober and Rosenberg a letter as follows:

"San Diego, California, August 15, 1922.
"Messrs. Rosenberg & Gollober,
        "San Francisco, California.

"Gentlemen: When we have complied with our contract with you, concerning the repayment to you for our account in the reorganization of our business enterprise at San Diego, California, known as Army Department Store, you are directed and hereby authorized to make and deliver bill of sale for all goods, wares and merchandise in and belonging to said store and business to George Shelley at Sacramento, California. This letter shall be your full and complete authority for making bill of sale as above directed and vesting title to such personal property in the said Geo. Shelley.

"Very truly yours,
                "LOUIS SHELLEY,
                "BENJ. SHELLEY,
                "ABE SHELLEY."

Plaintiff never received any bill of sale or other written memorial, either from Gollober and Rosenberg or from his three sons. However, on or about September 25, 1922, he paid Gollober and Rosenberg the balance of the $150,000, and on that date took possession of the store and of the merchandise therein pursuant to the oral agreement which he had made with his sons on August 14, 1922.

On September 26, 1922, plaintiff caused a notice to be recorded in the office of the recorder of San Diego County to the effect that he intended to purchase from Gollober and Rosenberg, and that the latter intended to sell to him, at the Army Department Store, on October 3, 1922, the stock of goods in the store and the accounts, notes, and bills receivable of the business; and on October 2, 1922, Gollober and Rosenberg caused a similar notice to be recorded, stating that they intended to sell to plaintiff, on October 10, 1922, all the stock of goods, merchandise, fixtures, and furnishings of the Army Department Store. It was on October 2, 1922, that defendant, as sheriff, levied upon the shoes under the writ of attachment in the action brought against the Shelley boys by one of their creditors.

The plaintiff in that action was a creditor of the Shelley boys at the time when the latter entered into their contract with Gollober and Rosenberg on March 22, 1922.

No notice of the oral assignment which the Shelley boys made to their father on August 14, 1922, was ever recorded in the county recorder's office. Appellant claims that this assignment is within the purview of the Bulk Sales Law, and that since no notice thereof was recorded, respondent' acquired no title to the property as against the attaching creditor—that as to such creditor the transfer to respondent is conclusively presumed to be fraudulent and void.

The Bulk Sales Law, found in section 3440 of the Civil Code, provides that the sale, transfer, or assignment of a stock in trade, in bulk or in any manner otherwise than in the ordinary course of trade and in the regular and usual practice and method of business of the vendor, transferor, or assignor, will be conclusively presumed to be fraudulent and void as against the existing creditors of the vendor, transferor, or assignor, unless at least seven days before the consummation of the sale, transfer, or assignment the vendor, transferor, or assignor, or the intended vendee, transferee, or assignee, shall record in the office of the county recorder in the county or counties in which the stock in trade is situated a notice of the intended sale, transfer, or assignment, stating the name and address of the intended vendor, transferor, or assignor and the name and address of the intended vendee, transferee, or assignee, together with a general statement of the character of the merchandise or property intended to be sold, transferred, or assigned, and the date when and the place where the purchase price or consideration, if any there be, is to be paid.

Appellant's theory of the case is this: In entering into their written agreement of March 22, 1922, it was the intention of the Shelley boys and of their transferees, Gollober and Rosenberg, that the stock in trade, as well as the other property mentioned in their contract, should be taken by Gollober and Rosenberg as security to insure the repayment to them of the amounts which they agreed to "advance" to pay the Shelley boys' creditors; also that it was intended that the property should be security to insure the payment to the transferees of an additional sum, $10,000, as a bonus

to compensate them for their services in reorganizing the business. Adopting this theory of the transaction, appellant contends that it was a pledge, and that, therefore, the legal title to the merchandise remained in the Shelley boys as pledgors. Hence it is claimed that the Shelley boys' assignment to their father on August 14, 1922, was the "sale" of stock in trade in bulk, within the meaning of the Bulk Sales Law, and was therefore void as to the attaching creditor, no recorded notice of such intended sale having been given. It is contended by respondent, on the other hand, that by the terms of their written contract with Gollober and Rosenberg the Shelley boys incurred no personal obligation to repay any of the moneys which might be advanced by their transferees to pay their creditors; that, therefore, there was no subsisting indebtedness due or to become due from the Shelley boys to their transferees to be secured by a transfer of the property; and that hence the transfer was not a pledge—that it was a sale with an optional right reserved to the vendors to repurchase, if they chose to do so within the stipulated time. Wherefore respondent claims that his three sons transferred to him no more than a mere optional right to purchase the property from Gollober and Rosenberg, and that the transfer of a right of that character is not within the purview of the Bulk Sales Law. The prime question in the case, then, is this: Was the stock in trade, of which the seized shoes formed a part, pledged to Gollober and Rosenberg, or was it sold to them?

[2] Under our statute a mortgagee of personal property in possession and a pledgee are practically, if not identically, the same. (Civ. Code, secs. 2924 and 2987.) No legal title passes in either case, but merely the right of possession for the purposes of security. (Civ. Code, sec. 2888.)

[3] It often is difficult to determine whether a particular transaction constitutes a pledge or a sale in which the right is reserved to the vendor to repurchase the property at a stipulated price within a given time. Whether it be one or the other must be determined by a consideration of the peculiar circumstances of each case. "A glance at the numerous adjudications in controversies of this kind," says the court in *Cornell* v. *Hall,* 22 Mich. 383, "will suffice to show that each case must be decided in view of the peculiar circumstances which belong to it and mark its character,

and that the only safe criterion is the intention of the parties, to be ascertained by considering their situation and the surrounding facts, as well as the written memorials of the transaction.''

[4] Though the agreement of the parties be reduced to writing, if there be a latent ambiguity therein, or if the language of the writing will admit of more than one interpretation, or if the intention of the parties is left in doubt from a reading of the document, parol evidence of the circumstances and of the situation of the parties may be considered in order to ascertain their true intention; and in this manner an issue of fact may be presented to the trial court for its determination. But where the language of the written contract is free from ambiguity or uncertainty, the determination of the intent of the parties, and hence a determination of the true character of the transaction, i. e., whether it is a pledge or a sale with the right of repurchase reserved to the vendor, presents a question of law for the court and not a question of fact. (*Palmer* v. *Gurnsey,* 7 Wend. (N. Y.) 248.) The supreme court of Vermont, in a case involving the question whether a deed and a bond given contemporaneously therewith by the grantees to the grantor created the relation of mortgagor and mortgagees, expresses itself thus: ''To ascertain the intent of the parties in entering into a contract or agreement, in a case where that intent upon the face of the instrument is doubtful, or the language used by them will admit of more than one interpretation, the court will look at the situation and motives of the parties making the contract or agreement, its subject matter and the object to be attained by it, and will allow these circumstances to be shown by parol evidence notwithstanding the contract itself is in writing. [Citing authorities.] But we discover no ambiguity in the terms of this bond and no necessity to resort to parol evidence of extraneous facts for a proper understanding of its provisions; and, in such instance, instruments of this character should always be construed according to the intention of the parties to be derived from the instrument itself.'' (*Wing* v. *Cooper,* 37 Vt. 169, 178, 179.)

With but one exception, presently to be noted, we can discern no ambiguity or uncertainty in the terms of the written contract between Gollober and Rosenberg and the

Shelley boys. Therefore, save as to that one exception there can be no necessity to resort to parol evidence of extraneous facts for a proper understanding of the intention of the parties. The exception to which we refer relates to the difference in amount between the maximum sum which Gollober and Rosenberg agreed to advance for the Shelley boys in order to effect the composition with creditors, viz., $140,000, and the sum which was to be collected by or to be paid to Gollober and Rosenberg to entitle the Shelley boys to a reconveyance, viz., $150,000. The difference between these two sums is $10,000. There are four possible purposes any one of which this $10,000 may have been intended to accomplish. That is to say, it is possible, for aught that appears upon the face of the instrument, that it was the intention of the parties that the $10,000 should represent: (1) an advance in the price over and above that paid by Gollober and Rosenberg, thus making a total purchase price of $150,000 to be received by the latter to entitle their vendors to repurchase; (2) interest on the sums which Gollober and Rosenberg obligated themselves to advance for the benefit of their transferors in settling the claims of creditors; (3) a bonus to compensate Gollober and Rosenberg for their efforts in reorganizing the business; or (4) a bonus to cover both legal interest and compensation for reorganizing the business. The uncontradicted evidence in the case is sufficient to exclude the first of these possible purposes. A witness for respondent, a bookkeeper who made the first entries in his books opened by Gollober and Rosenberg when the latter took possession of the store, testified that when "setting up" the books under Rosenberg's direction he was told that the amount which Gollober and Rosenberg were "to get back" included "an item of *bonus* of $10,000." That the $10,000 was regarded as a "bonus" seems to be undisputed. [5] In its strict sense, "bonus" means good. In its popular sense it has several meanings. One of them is that a bonus is a sum paid for services in addition to or in excess of what ordinarily would be given—an advantage or benefit given in return for a benefit received. Another meaning is that it is a premium paid for a loan. (9 C. J., pp. 135, 136.) Whatever meaning be given the word as used by the witness in this case, the expression "bonus" seems clearly to ex-

clude the idea that the $10,000 was intended to represent
an advance over and above any purchase price paid by
Gollober and Rosenberg for the property. [6] It seems
equally clear that it was not the intention of the parties
that the $10,000 should represent a premium to be paid by
the Shelley boys by way of interest on the sums to be ad-
vanced by their transferees to pay their creditors. If that
were the purpose of the arrangement concerning the $10,000
it would violate the usury law of this state and would sub-
ject Gollober and Rosenberg to punishment for a misde-
meanor. (Gen. Laws, Act No. 3757, p. 1384.) An inter-
pretation which would make lawbreakers of the parties to
the transaction should be rejected if there be another possible
and reasonable interpretation, as there unquestionably is.
Either the third or the fourth of the above-mentioned pos-
sible purposes for the arrangement will reasonably explain
why it was that the parties added the sum of $10,000 to
the $140,000 so as to make $150,000 the amount to be col-
lected by or paid to Gollober and Rosenberg as a condition
precedent to a retransfer by them. As between the third
and fourth possible purposes for this difference of $10,000, we
think the latter is the one which probably represents the
real intent of the parties. That is to say, from the testi-
mony of respondent's own witness, the bookkeeper, as
well as from the circumstances disclosed by the writing
itself, we are of the opinion that the $10,000 was intended
as a bonus to cover both compensation to Gollober and Rosen-
berg for their business sagacity and trouble in reorganizing
the business and interest at the legal rate on the sums which
they agreed to advance for the benefit of their transferors.

[7] Gollober and Rosenberg agreed to "advance" a
sufficient amount of money, up to $140,000, to effect the
composition with the Shelley boys' creditors. This word
"advance," when used in relation to advances of money
by one person for the benefit of another, usually implies a
loan. (2 C. J. 32.) "The import of the word 'advance,' "
says the court in *Morrow* v. *Turney*, 35 Ala. 131, 137, "is
such as rather to indicate that there was a loan, than
payment of purchase money." Since the money paid to
the creditors by Gollober and Rosenberg was money advanced
by them for the benefit of the Shelley boys, a promise on
the part of the latter to repay the sums so advanced, with

legal interest thereon, as well as a promise to pay Gollober and Rosenberg for the services performed by them in operating the store and in reorganizing the business, would be implied in fact as well as in law, and they would be personally liable therefor (*Couts* v. *Winston*, 153 Cal. 686, 691 [96 Pac. 357]; *Todd* v. *Todd*, 164 Cal. 255, 258 [128 Pac. 413]), provided such personal liability is not excluded by the terms of their written contract.

[8] The writing executed by the Shelley boys and Gollober and Rosenberg is silent with respect to the assumption by the former of any personal obligation to repay the advances made on their behalf by the latter. The instrument also is silent as to any compensation, *eo nomine*, to be paid to Gollober and Rosenberg for their services in operating the store and in reorganizing the business. The document appears upon its face to be a complete expression of the whole agreement between the parties. This being the case, it is to be presumed that the parties introduced into their writing every material item and term of their contract. (*Harrison* v. *McCormick*, 89 Cal. 327, 330 [23 Am. St. Rep. 469, 26 Pac. 830].) We shall assume, therefore, for the purpose of this decision, that no personal obligation rested upon the Shelley boys to repay any part of the $150,000 upon the receipt of which by Gollober and Rosenberg the latter undertook to reconvey so much of the property as then remained on hand.

The fact that the Shelley boys incurred no personal obligation to pay the $150,000, or any part thereof, is the main prop to respondent's argument that the transaction was a sale and not a pledge. Without doubt, the absence of such personal liability is a circumstance of no inconsiderable importance in settling that question, but it is by no means a determinative circumstance. It is of course true, as respondent claims, that if there be no debt there can be no pledge or mortgage. [9] At all events, it is well settled that the existence of a pledge or of a mortgage implies an obligation *to be secured thereby;* but what the remedies may be for enforcing it is quite another question. There may be a debt *quoad* the security, but not in respect to any personal remedy for its enforcement. That is to say, while the essential feature necessary to create a pledge or a mortgage is that the property pledged or mortgaged

should be intended as security, personal liability on the part of the pledgor or mortgagor for the debt or other obligation secured by the pledge or mortgage is not an indispensable requisite. (*Wing* v. *Cooper, supra; Pioneer Gold Min. Co.* v. *Baker,* 10 Sawy. 594, 23 Fed. 258; *Mobile Building & L. Assn.* v. *Robertson,* 65 Ala. 382, 389; *Kraemer* v. *Adelsberger,* 122 N. Y. 467 [25 N. E. 859]; *Matthews* v. *Sheehan,* 69 N. Y. 585; *Brown* v. *Dewey,* 1 Sand. Ch. 56—reversed in 2 Barb. 28, not upon the law but upon the facts, as is stated in *Matthews* v. *Sheehan, supra; Mills* v. *Darling,* 43 Me. 565; *Fisk* v. *Stewart,* 24 Minn. 97; *Rice* v. *Rice,* 4 Pick. (Mass.) 349; *Campbell* v. *Dearborn,* 109 Mass. 130 [12 Am. Rep. 671]; *Cook* v. *Johnson,* 165 Mass. 245 [43 N. E. 96]; note on p. 390 et seq., L. R. A. 1916B; note to *Wells* v. *Flynn,* 17 A. L. R. 718.) It is expressly declared in this state by statutory enactment that "the creation of a lien does not of itself imply that any person is bound to perform the act for which the lien is a security." (Civ. Code, sec. 2890.) The rule is expressed in *Wing* v. *Cooper, supra,* as follows: "It is said, on the part of the defendants, that there was no debt existing from Briggs to them; but there was a debt which was capable of being enforced against the property which Briggs conveyed to them, and the absence of any personal liability on the part of Briggs to pay the money advanced or to be advanced by them in satisfaction of the levies is not a conclusive test whether the conveyance was intended to be absolute or a security merely. It was not necessary that there should be a liability on the part of Briggs to pay, as well as on the part of his grantees to release or reconvey on being paid, to constitute the transaction a mortgage; yet the want of this mutuality is proper to be considered in determining whether the transaction was a mortgage or not, though it is not of itself decisive. If a debt capable of being enforced in any way against either the person *or the property* [italics ours] of Briggs was purposely kept on foot, and if the conveyance by him was intended to secure the payment of that debt, the transaction was in fact a mortgage, and the estate was defeasible and redeemable, although there was no covenant or other personal obligation on his part to pay the money." In *Pioneer Gold Min. Co.* v. *Baker, supra,* Judge Sabin, speaking of a situation somewhat analogous to that presented here,

said: " . . . a mortgage may be created as well without as with an accompanying personal obligation of the mortgagor to pay the debt secured, or attempted to be secured, thereby. In the one case the property alone is charged with the lien—that is looked to solely by the mortgagee out of which to make his lien; in the other, he has the additional security of the personal obligation of the mortgagor. A debt chargeable only against certain property is, in effect, simply a debt with limited means of satisfaction or enforcement; the value of the property charged with the indebtedness is the measure of the security afforded. And this is exactly the security taken by Baker in 1874, when he sold this mine for the balance of the purchase money, $125,000.00." The law on this subject is well stated by Judge Parker in *Kraemer* v. *Adelsberger, supra.* He says: "In determining whether a contract is to be treated as a mortgage or a conditional sale, or a conveyance in fee, courts have commented upon the presence or absence of various particulars which commonly accompany mortgages, but the essential feature necessary to create a mortgage is that it should be a conveyance intended as a security. Such evidently was the purpose of the contract before us, but the plaintiff calls attention to the absence of a covenant to pay the amount of the indebtedness. It was agreed that interest should be paid on the full amount; that, after sales should be made, the proceeds should be applied in reduction of the amount of the then existing obligation; and that the firm would pay the difference if any should remain. So that, while there was not an agreement in terms to pay the entire indebtedness, such may be said to have been the purpose and effect of the agreement; *but in any event the absence of such a covenant is not conclusive, but is a circumstance to be considered in construing the contract.*" (Italics ours.) The same learned jurist, in *Hughes* v. *Harlam,* 166 N. Y. 427 [60 N. E. 22], employed this language: "That the agreement expresses an intent to transfer the property absolutely to Harlam upon Hughes' death without paying the loan is unquestionably true, but that fact, considered with the other provisions of the agreement, does not necessarily give to the entire agreement the character of a conditional sale, for a sale by the one party and a purchase by the other was not the leading object of the transaction.

Indeed, the agreement clearly indicates that the one did not intend to buy, nor the other to sell, unless it should turn out that the borrower should not be able to pay the loan before his death. . . . It seems to us that the main purpose of the parties to the agreement, as manifested by its terms, was on the one part to procure a loan of money, and on the other to assure its repayment; and it has been a long established rule in equity that the 'court looks beyond the terms of the instrument to the real transaction; and when that is shown to be one of security, and not of sale, it will give effect to the actual contract of the parties.' . . . So, while it is true, as counsel for the appellant so ably argues, that this agreement contains elements of both mortgage and conditional sale, still, as the *leading purpose* of the instrument [italics ours] is that of security, it must be governed by those principles which courts of equity have long applied to agreements for security." The cases cited by respondent present no conflict with these views. Take, for example, *Henley* v. *Hotaling,* 41 Cal. 22—a case upon which respondent places much reliance. That was a case where the evidence clearly and conclusively disclosed a deliberate intention on the part of both parties to the transaction that it should be a sale and not a mortgage. No such situation exists here.

[10] If, now, the writing which was executed by Gollober and Rosenberg and the three Shelley boys on March 22, 1922, be examined in the light of the foregoing, it will, we think, clearly appear that the parties intended that the arrangement should operate as a pledge of the personal property. It doubtless is true that the document contains elements of both a pledge and a sale. But a careful consideration of all its terms leads the mind irresistibly to the conclusion that the leading purpose of the parties, as manifested by their writing, was, on the part of the Shelley boys, to enjoy the benefit of certain sums of money to be advanced for them in satisfying the demands of their creditors, and, on the part of Gollober and Rosenberg, to assure the repayment to them of an amount which would reimburse them for the sums they were to advance to pay the creditors, and at the same time to compensate them for their services in operating the store and in reorganizing the business.

That the parties intended the property to be held by Gollober and Rosenberg as security is unmistakably disclosed by certain strongly marked features shown on the face of the writing itself. In the first place, the transaction had its inception in a negotiation for a loan, or for what is the equivalent of a loan, to the Shelley boys, even if the latter did not become personally liable therefor. This is one of the principal *indicia* of a pledge. "As a general rule," says the court in *Holmes* v. *Grant,* 8 Paige (N. Y.), 258, "where the contract and conveyance are made upon an application for the loan of money, this court for the purpose of preventing usury and extortion will construe it to be a mortgage, whenever the person to whom the application for the loan is made agrees to receive back the money advanced, with legal interest, *or a larger amount* [italics ours], and to reconvey the property within a specified time thereafter, whatever may be the form of the written contract; if it is apparent that the real transaction was a loan of money." In *Turner* v. *Wilkinson,* 72 Ala. 361 (cited with approval in *Douglas* v. *Moody,* 80 Ala. 61, and *Daniels* v. *Lowery,* 92 Ala. 519 [8 South. 352]), the court, in considering the tests to determine the true character of such contracts, says: "Although it is difficult to establish fixed rules by which to determine whether a particular transaction is a mortgage or a conditional sale, there are some facts which are regarded as of controlling importance in determining the question. Did the relation of debtor and creditor exist, before and at the time of the transaction? *or if not, did the transaction commence in a negotiation for a loan of money?* Was there great disparity between the value of the property and the consideration passing for it? Is there a debt continuing, for the payment of which the vendor is liable If *any* one of these facts is found to exist, in a doubtful case, it will go far to show a mortgage was intended." (Italics ours.)

Another circumstance which lends much strength to the view that the property was transferred to Gollober and Rosenberg to be held by them as "security" is the fact that the transfer to them lacks the leading and characteristic element of the usual sale, i. e., a definite amount agreed upon by the parties as a price to be paid by Gollober and Rosenberg. Those gentlemen did not bind themselves to

advance $140,000 in any event. Their agreement was to advance to the creditors of the Shelley boys a sufficient amount to effect the composition "up to the sum of $140,-000." That is to say, while they were not obliged to advance more than a maximum of $140,000, their obligation would be fulfilled upon their paying to the creditors an amount sufficient to effect the composition, though it should turn out to be less than $140,000. Indeed, the bookkeeper's testimony tends to show that, all told, Gollober and Rosenberg advanced to the creditors but $68,000.

Another circumstance which very materially strengthens the view that the transaction was a pledge is the fact that Gollober and Rosenberg obligated themselves to apply the proceeds of the business to the payment of the expenses incurred in its operation. If the transaction were a sale, the proceeds of the business would belong to Gollober and Rosenberg, to do with as they pleased. Another circumstance is this: Under the terms of the contract Gollober and Rosenberg were to retain all moneys received by them from the sales of merchandise only in the event that they did not collect, or were not paid, the stipulated amount, $150,000, within the agreed time. As a corollary to this provision, it necessarily follows that if Gollober and Rosenberg did succeed in collecting, or were in fact paid, the full amount within the agreed time, then the other parties to the contract, the Shelley boys, were to receive the avails then on hand of all property and merchandise previously sold by Gollober and Rosenberg. This circumstance shows that it was not the intention of the Shelley boys to part with any more of their interest in the property than might be sufficient to satisfy the amount due Gollober and Rosenberg for the advances made by them in liquidating the claims of creditors, plus the "bonus" of $10,000. (*Palmer v. Gurnsey, supra.*) There are other circumstances disclosed by the written contract which point unerringly to a pledge and not a sale, but we do not find it necessary further to advert to them.

Thus far we have confined ourselves to a consideration of the terms of the written instrument itself, aided only by such oral evidence as tends to explain why it was that Gollober and Rosenberg, though agreeing to make advances up to $140,000, were to receive $150,000. But if we were

to consider all of the oral testimony bearing upon the question of intention—and that testimony is very meager—we still would be compelled to arrive at the conclusion that it was the intention of the parties that the property transferred to Gollober and Rosenberg should be held by them for the purpose of security, and that as to the personal property the transaction was a pledge. Respondent testified that on August 14, 1922, when a balance of about $30,000 remained uncollected by and unpaid to Gollober and Rosenberg, his three sons told him that "the store was small *security* for that $30,000 which they owed Gollober." Asked if on August 14, 1922, he considered that his three sons owned the store subject to a "lien" of Gollober and Rosenberg for the $30,000, together with such amount as his sons owed him, respondent answered, "I believe yes, they would be." True, respondent and his three sons seem to have thought that if the $150,000 were not collected by or paid to Gollober and Rosenberg before the expiration of the stipulated time the latter would own the property. But, on the other hand, respondent and his three sons seem to have thought that immediately upon the $150,000 being collected by or paid to Gollober and Rosenberg, within the agreed time, respondent, as the transferee of his sons, was entitled to take possession and claim the property without any action whatever on the part of Gollober and Rosenberg, such as the execution to him of a bill of sale by the latter. However, we do not think that much significance should be attached to any of these circumstances. It is the intention of the parties at the inception of the transaction which is to determine its character, and that intention is to be ascertained from the language of their instrument, aided, if need be, by the then existing circumstances. "The intention of the parties," says the court in *Mobile Building & L. Assn.* v. *Robertson, supra,* "at the inception and consummation of the transaction—the relation it was contemplated they should bear to each other—is the criterion by which the character of the contract must be determined. There is much evidence introduced, having a tendency to show that the transaction was regarded in the one light by the association and in the other by the appellee. To this evidence but little if any importance can be attached. It is not the intention of the one party, dissociated

from the intention of the other, which is to be ascertained. It is their concurring intention, when the transaction ripened into the contract, which must be ascertained and which must prevail." And in *Williams* v. *Chadwick*, 74 Conn. 252 [50 Atl. 720], the court says: "Whether or not the parties intended a particular transfer of property to be a mortgage is to be determined by the character and language of the instruments intentionally executed by them, and by the surrounding facts, rather than by the belief of the parties as to the effect of their acts."

Concluding, as we do, that it must be held as a matter of law, from the face of the instrument itself, that the transaction was a pledge and not a sale, and that as a consequence the legal title remained all the while in the Shelley boys, we come now to another point presented to us for consideration. It is claimed by respondent that even if the ownership did remain in his three sons, their transfer to him is not within the purview of the Bulk Sales Law, because the property was not at that time in their possession or under their control. We are unable to agree with this contention. Section 3440, which declares what transfers are deemed to be constructively fraudulent, deals with two major classes of conveyances. The first class includes those transfers of personal property which are conclusively presumed to be fraudulent because not "accompanied by an immediate delivery and followed by actual and continued change of possession." As to such transfers the statute expressly declares that the presumption of fraud attaches "if" the transfer is "made by a person having at the time the possession or control of the property." This language implies, as a necessary corollary, the proposition that the transfers dealt with in the first part of the section are not presumptively fraudulent or void if made by persons not having at the time the possession or control of the property. The second major class of transfers which the section declares to be constructively fraudulent are sales and transfers of "a stock in trade in bulk." It is this latter class of transfers which is covered by what is commonly known as the Bulk Sales Law, adopted in 1903 when the legislature amended section 3440 by adding the provisions relative to the sale of "stock in trade in bulk." Unlike the restrictions found in the first part of the section,

73 Cal. App.—5

those added in 1903 do not exempt from their operation bulk sales of stock in trade of which the vendor has not the possession or control. That is to say, the language of the Bulk Sales Law is broad enough to include every sale, transfer, or assignment of stock in trade in bulk, regardless of whether the vendor has or has not the possession or control of the property. An interpretation which would read into this part of the section a provision that every sale in bulk made without the requisite statutory notice is nevertheless valid as against existing creditors if the vendor, transferor, or assignor has not at the time the actual possession or control of the stock in trade, regardless of what the other circumstances might be, not only would overturn the Bulk Sales Law as it is written but would leave creditors helpless; for in the main such creditors could not protect themselves against an arrangement which although secret was lawful. No one could safely give credit on the faith of the debtor's title to his property, however valuable that title might be; as, for example, where the value of a pledgor's merchandise exceeds the amount of the debt secured by the pledge. A door to fraud would be opened and many would enter, to the injury of credit and the confusion of business.

No case directly in point has been called to our attention. The only one which we have been able to discover that even remotely approaches the point is *Krower* v. *Martin* (Tex. Civ. App.), 184 S. W. 511. In that case, however, not only was possession delivered to the mortgagees but the articles were completely segregated from the mortgagor's "stock of merchandise." The articles remained with the mortgagees until the mortgagor sold them to the appellee. Never after they were mortgaged did they become a part of the stock of goods from which they were taken, and never thereafter were they exposed to sale. As a consequence, they were no part of a merchant's stock in trade or stock of merchandise at the date of the sale to the appellee, and hence that sale was not within the terms of the Bulk Sales Law. No such situation exists in the case now before us. It has been said that the scope and purpose of these laws is to regulate the sale in bulk of such articles as constitute the "stock in trade" or "stock of merchandise" which is kept by a merchant for sale in the ordinary course

of business.   Here the articles to which respondent acquired the pledgors' title continued to be the "stock in trade" of the pledgors as well after as before their transfer to the pledgees.   There was no segregation of the stock in trade when it was pledged to Gollober and Rosenberg.   It remained in the Army Department Store, and the Shelley boys continued to be the owners thereof, subject only to the lien and the right of possession held by Gollober and Rosenberg as pledgees.   The store and its contents were delivered into the possession of Gollober and Rosenberg not only to protect their rights as pledgees, but also to enable them to reorganize the business for the benefit of the pledgors in case the property should be redeemed from the pledge. This is indicated by many circumstances in the case, among which is the significant language of the pledgors in their letter of August 15, 1922, to the pledgees, in which they say: "When we have complied with our contract with you concerning the repayment to you for our account in the *reorganization* of *our* business at San Diego," etc.   Save that the store was managed by the pledgees under the personal direction of their own manager, sent by them from San Francisco to take possession of the store and to operate it, the business continued as before without any radical outward sign of change.

In view of the circumstances above narrated, the purpose of the Bulk Sales Law to protect existing creditors would be entirely frustrated if it should receive an interpretation that would uphold the Shelley boys' transfer to their father of their title to this stock in trade, in the absence of any recorded notice thereof.   That this is so will be seen from a consideration of the following: The attaching creditor is conclusively presumed to have had notice of his debtors' transfer of the property to Gollober and Rosenberg as pledgees; for notice of that intended transfer was given in the manner required by the Bulk Sales Law.   Though charged with notice of that transfer—in reality a pledge—the creditor took no steps to attach the property before the consummation of the transfer to Gollober and Rosenberg.   It is quite possible that his failure to do so at that time was due to a belief on his part that the transferees would successfully reorganize the business, realize from their sales of the real property and from their conduct of the business the $150,000

upon the receipt of which they were to reconvey the property on hand to the Shelley boys, that the latter would thus become reinvested with an unencumbered title at the end of the four months, and that, as a consequence, his position, as a creditor of the Shelley boys, would be as good as, if not better than, it was before the transfer to Gollober and Rosenberg and the reorganization of the business by them. Having refrained from attaching the property prior to the consummation of that transfer, the attaching creditor would now be the victim of a grave injustice if he should lose his right to question the validity of the transfer to respondent merely because his debtors, instead of retaking the manual possession and the personal control of the stock in trade, saw fit to divert that possession and control from a channel leading toward themselves to one which led to their father, the respondent here.

It follows from what we have said that the attempted transfer of the personal property to respondent is conclusively presumed to be fraudulent, and, therefore, void as against nonconsenting creditors. There was, therefore, nothing in the transaction which militated against the right of appellant as sheriff to seize the property under the writ of attachment which had been placed in his hands.

The appeal from the order denying the motion for a new trial is dismissed. The judgment is reversed.

Works, J., and Craig, J., concurred.